UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | No. 14 CR 385 |
| v. | ) | |
| | ) | Hon. Edmond E. Chang |
| ANTHONY GALVAN | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

As the Seventh Circuit has often noted, "weapons are tools of the trade of drug dealers." *United States v. Spaulding*, 366 F. App'x 670 (7th Cir. 2010) (citing *United States v. Cooper*, 19 F.3d 1154, 1163 (7th Cir. 1994)). For Anthony Galvan, this is definitely true. Anthony Galvan sold guns and drugs illegally. Galvan, however, was a gun dealer who also sold drugs, as opposed to drug dealer who armed himself with guns for protection. In either instance, the same level of danger emanates from the presence of drugs and guns together. For the reasons set forth below, the government respectfully requests that this Court sentence defendant Anthony Galvan to a term of imprisonment within the advisory custody Guidelines range of 33-41 months' imprisonment.[1]

**I. INTRODUCTION AND BACKGROUND**

As set forth in the Government's Version and the Criminal Complaint, *see* R.1, defendant Anthony Galvan conducted seven controlled buys with a CPD undercover officer, five of which included the sale of firearms, and four of which

---

[1] The government's sentencing memorandum was due by October 19, 2015. The undersigned finished a jury trial today (October 20, 2015), and requests leave of Court to file the instant sentencing memorandum one day late *nunc pro tunc*.

1

involved the sale of cocaine. The transactions were conducted in front of Galvan's residence in Harvey, Illinois. Each transaction was arranged with Galvan either through recorded telephone calls, or through text messages. Each interaction was also audio-recorded.

On August 5, 2014, a grand jury sitting in the Northern District of Illinois returned an indictment, charging Galvan with (1) willfully engaging in the business of dealing in firearms without a license, in violation of Title 18, United States Code, Section 922(a)(1)(A) (Count One); (2) knowingly receiving a firearm that had been transported in interstate commerce while under indictment for a felony offense, in violation of Title 18, United States Code, Section 922(n) (Counts Two and Four); and (3) distribution of cocaine, in violation of Title 21, United States Code, Section 841(a)(1) (Counts Three, Five, Six, and Seven). (R.1). On July 14, 2015, Galvan entered a negotiated plea of guilty pursuant to a written plea agreement to Counts One and Three in the Indictment. (R.48). Galvan is currently in the custody of the United States Marshals Service.

## II. CALCULATION OF THE ADVISORY CUSTODY GUIDELINES RANGE IN THE PRESENTENCE INVESTIGATION REPORT

The government has no objection to the calculation of the advisory custody Guidelines range as set forth in the PSR.

With respect to Count One, pursuant to Guideline § 2K2.1(a)(6), the base offense level is 14 because Galvan was a prohibited person at the time he committed the instant offense. Pursuant to Guideline § 2K2.1(b)(1)(A), the offense level is increased by 2 because the offense involved between 3 and 7 firearms. Pursuant to

Guideline § 2K2.1(b)(4), the offense level is increased by an additional 2 because the offense involved a stolen firearm, namely, the Bryco Arms Model 38, .380 caliber pistol, bearing serial number 1293583. Pursuant to Guideline § 2K2.1(b)(5), the offense level is increased by 4 because Galvan engaged in the trafficking of firearms. The total offense level for Count One, therefore, is 22.

With respect to Count Three, pursuant to Guideline §§ 2D1.1(a)(5) and (c)(14), the offense level for Count Three is 12 because the offense, including relevant conduct, involved less than 25 grams of cocaine. The total offense level for Count Three, therefore, is 12.

Pursuant to Guideline § 3D1.2, Counts One and Three are treated as separate groups. Pursuant to Guideline §§ 3D1.4(a) and (c), Count One counts as one unit and Count Three does not count as any units because Count Three is 9 or more levels less serious than Count One. Pursuant to Guideline § 3D1.4, the combined offense level, therefore, is 22.

To date, Galvan has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct and timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. It is the government's position, therefore, that a three-point reduction in the offense level is appropriate, pursuant to Guideline §§ 3E1.1(a) and (b).

Under the version of the Guidelines currently in effect, Galvan's anticipated total offense level, therefore, is 19.

Based on the facts currently known to the government, Galvan has three criminal history points. In or around June 2015, Galvan was convicted of armed violence and possession of a controlled substance in the Circuit Court of Cook County in case number 13C66112401, and received a sentence of 15 years' imprisonment. Pursuant to Guideline § 4A1.1(a), Galvan receives three criminal history points for this conviction. Three criminal history points places Galvan in criminal history category II.

Accordingly, a total offense level of 19, coupled with a criminal history category II, results in an advisory custody Guidelines range of 33 to 41 months' imprisonment, in addition to any supervised release and fine the Court may impose.

### III. THE GOVERNMENT'S SENTENCING RECOMMENDATION

#### A. Nature and Circumstances of the Offense

Section 3553(a) of Title 18 of the United States Code instructs district courts to consider the need for the sentence to reflect the seriousness of the offense and to provide just punishment for the offense. Unfortunately, now more than ever, the Northern District of Illinois suffers from a record high number of homicides and shootings resulting from, at least in part, the proliferation of firearms on the streets of Chicago. Galvan contributed to that easy access of firearms by putting guns (and drugs) onto the street illegally. He was, at all times, ready, willing and able to sell guns and drugs to the confidential source. Below is a recitation of what Galvan sold to the undercover officer and when:

- January 14, 2014, Galvan sold a Bryco Arms, Model 38, .380 caliber pistol, bearing serial number 1293583, as well as approximately 1.7 grams of cocaine, to the undercover officer. Galvan also provided an extra loaded magazine to the undercover officer;

- January 16, 2014, Galvan sold a Raven Arms, Model MP25, .25 caliber pistol, bearing serial number 1467045, with a magazine containing six live rounds of .25 caliber ammunition, to the undercover officer;

- January 22, 2014, Galvan sold a Taurus, Model PT99, 9mm caliber pistol, bearing serial number TPD78596 and a Phoenix Arms, Model HP25A, .25 caliber pistol, bearing serial number 4400562, to the undercover officer;

- January 30, 2014, Galvan sold an F.I.E. Corp. Model 38st .38 caliber revolver, bearing serial number St35533 to the undercover officer;

- February 8, 2014, Galvan sold approximately 2.7 grams of cocaine to the undercover officer;

- February 12, 2014, Galvan sold approximately 3.0 grams of cocaine to the undercover officer;

- February 20, 2014, Galvan sold an RG Industries, Model RG14, .22 caliber revolver, bearing serial number L748730, along with six live

rounds of .22 caliber ammunition and approximately 1.7 grams of cocaine.

In total, during January and February of 2014, Galvan sold approximately 10 grams of cocaine an undercover source.

Additionally, comments made by the defendant throughout the investigation reflects upon his intentional and careful steps to evade law enforcement as well as his general knowledge of gun trafficking and how to obtain a firearm illegally. For example after the transaction on January 16, 2014, the undercover officer stated that he attempted to apply for "one of them cards to buy some pistols," referring to a Firearm Owner's Identification Card, but that his/her application was denied. Galvan responded how his sister-in-law has a FOID card and buys bullets. Galvan further advised that sellers do not conduct background checks for firearm purchases at Indiana gun shows, explaining, "No background no nothing. The guns out there are cheap." Likewise during the transaction on January 22, 2013, the undercover officer and Galvan discussed the quality of the Taurus pistol. The undercover officer asked if it would work, which Galvan explained that he had just cleaned it, adding: "We was cleaning everything because my friend cleaned the fingerprints, can you feel me? I'm not gonna sell it to nobody a gun with my fingerprints on it."

### B. Search of defendant's residence

On July 8, 2014, several months after the last controlled purchase from Galvan, law enforcement executed a search warrant on his residence. That search revealed an arsenal of ammunition, which demonstrates defendant was a more

experienced and prolific gun trafficker than the isolated incidents with the confidential source charged in the Indictment.

During the search of defendant's residence, federal law enforcement recovered nearly 200 rounds of ammunition. For example, in a "trap" under the floorboards in the north upstairs bedroom, law enforcement recovered the following:

- 6 Winchester-Western .40 rounds;
- 6 Federal 9mm rounds;
- 4 Remington .22 rounds;
- 1 black 9mm magazine;
- 17 Winchester-Western 9mm rounds;
- 2 assorted rounds;
- Black Tanfoglio Italy .40 magazine containing 2 S&W .40 rounds;
- S&W .40 magazine;
- Black Ruger SR9 9mm magazine; and
- Black Butler Creek 25/22 magazine.

Under a vent in the North upstairs bedroom, the search revealed additional ammunition:

- 25 Sellier & Bellot .40 rounds;
- 1 Federal .45 round;
- 7 Winchester-Western .22 rounds;
- 16 Remington .22 rounds;
- 10 Sellier & Bellot .765 rounds;
- 4 Sellier & Bellot .635 rounds;
- 45 unknown make .22 rounds;
- 3 Remington 380 rounds;
- 2 Winchester-Western .32 rounds; and
- 3 spent .22 rounds.

Likewise, law enforcement recovered the following in a mattress in a first floor bedroom:

- 24 S&W .40 rounds.

Under the floorboards in the back porch area, law enforcement recovered a firearm as well as more ammunition:

- Glock Model 23Gen4 .40 pistol bearing serial number VMR769;
- Gun box for the Glock Model 23Gen4; and
- 12 S&W .40 rounds (recovered loaded in the Glock Model 23Gen4).

The way the defendant secreted and concealed the ammunition – in a trap, in a mattress, and in a floorboard – reflects upon his unlawful possession of these items and his sophistication as a gun trafficker.

**C.  Defendant's History and Characteristics**

On or about August 23, 2013, the Harvey Police Department executed a search warrant on the defendant's residence. During that search, law enforcement recovered a loaded pistol with one round in the chamber, as well as a digital scale and approximately 3.7 grams of cocaine. Defendant was found guilty after trial on May 16, 2015. On June 22, 2015, defendant was sentenced to 15 years' custody in the Illinois Department of Corrections.[2]

Defendant's criminal history is limited to a single conviction, albeit a very recent one. This prior conviction for possession of a firearm and drugs is relevant because even after law enforcement executed the search warrant on his residence in August 2013, Galvan was not deterred but continued his criminal ways as he proceeded to sell guns and drugs to the undercover officer less than five months later.

---

[2] The government is attempting to obtain additional facts related to Galvan's prior conviction, and, if it is able to do so, the government will supplement this filing.

### D. Supervised Release

Consistent with the Seventh Circuit's guidance in *United States v. Thompson*, 777 F.3d 368 (7th Cir. 2015), and in addition to the imposition of a sentence within the advisory custody Guidelines range, the government recommends the imposition of a term of supervised release of three years, which is the minimum term mandated by the statute of conviction related to the drug count (21 U.S.C. §841(b)(1)(C)).

*Mandatory Conditions*

With respect to the mandatory conditions, the September 9, 2015, PSR recommended the following mandatory conditions: (1) "not commit another Federal, State, or local crime," (PSR, Mandatory Condition #1); (2) "not unlawfully possess a controlled substance," (PSR, Mandatory Condition #2); (3) "cooperate in the collection of a DNA sample if the collection of such a sample is required by law," (PSR, Mandatory Condition, #5); and (4) refrain from unlawful use of a controlled substance and submit to drug testing as specified, (PSR, Mandatory Condition, #6). The government agrees with the imposition of these mandatory conditions, and no matter, given that these conditions are mandated by statute, the Court need not give any reason or explanation for the imposition of these mandatory conditions. *United States v. Bryant*, 754 F.3d 443, 445 (7th Cir. 2014) (discussing the mandatory condition that a defendant must cooperate in the collection of a DNA sample, and explaining that "[s]ince it was mandatory, no reason needed to be given for its imposition").

### *Discretionary Conditions*

In addition to the mandatory conditions, the Court has discretion to impose additional conditions of supervised release (1) that are "reasonably related" to the factors set forth in 18 U.S.C. §§ 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D); (2) that "involve[] no greater deprivation of liberty than is reasonably necessary" to meet the goals of 18 U.S.C. §§ 3553 (a)(2)(B), (a)(2)(C), and (a)(2)(D); and (3) that are "consistent with any pertinent policy statements issued by the Sentencing Commission." 18 U.S.C. § 3583(d); *United States v. Shannon*, 743 F.3d 496, 500 (7th Cir. 2014). Section 3583(d) points to the discretionary conditions set forth in § 3563(b).

Discretionary conditions 4, 6, 7-9, as numbered in the PSR, below support Galvan's rehabilitation and reintegration into the community and would help ensure that the defendant is engaged in lawful pursuits rather than criminal activity. In the same way, discretionary conditions 14-18, as numbered in the PSR, facilitate supervision of Galvan by the probation officer, thus assisting in encouraging defendant's compliance with the law and deterring the defendant from future crimes.

- "[S]eek, and work conscientiously, at lawful employment or pursue conscientiously a course of study or vocational training that will equip the defendant for employment," (PSR, Discretionary Condition #4);

- "[R]efrain from knowingly meeting, communicating, or otherwise interacting with a person whom he knows to be engaged, or planning to be engaged, in criminal activity," (PSR, Discretionary Condition #6);

- "[R]efrain from excessive use of alcohol (defined as consuming 15 drinks or more per week),[3] or any use of a narcotic drug or other controlled substance, as defined in § 102 of the Controlled Substances Act (21 U.S.C. § 802), without a prescription by a licensed medical practitioner," (PSR, Discretionary Condition #7);

- "[R]efrain from possessing a firearm, destructive device, or other dangerous weapon," (PSR, Discretionary Condition #8);

- "[P]articipate, at the direction of a probation officer, in a substance abuse treatment program, which may include urine testing up to a maximum of 104 tests per year," (PSR, Discretionary Condition #9);

- "[R]efrain from knowingly leaving the jurisdiction where the defendant is being supervised, unless granted permission to leave by the court or a probation officer," (PSR, Discretionary Condition #14);[4]

- "[R]eport to a probation officer as directed by the court or a probation officer," (PSR, Discretionary Condition #15);

- "[P]ermit a probation officer to visit the defendant at any reasonable time at home, at work, [or] at school," and "permit confiscation of any contraband observed in plain view of the probation officer," (PSR, Discretionary Condition #16);

- "[N]otify a probation officer promptly, within 72 hours, of any change in residence, employer, or workplace and, absent constitutional or other legal privilege, answer inquiries by a probation officer," (PSR, Discretionary Condition #17); and

- "[N]otify a probation officer, within 72 hours, if arrested or questioned by a law enforcement officer," (PSR, Discretionary Condition #18).

---

[3] The probation office defined "excessive use" as "having a blood alcohol concentration greater than 0.08." (PSR, Discretionary Condition #7). The government recommends that defining "excessive use" by a number and time frame, such as 15 drinks per week, provides greater clarity and direction to the defendant. *See United States v. Siegel*, 753 F.3d 705, 715 (7th Cir. 2014); *United States v. Kappes*, 782 F.3d 828, 849 (7th Cir. 2015).

[4] The government recommends amending this condition from "remain within the jurisdiction" to "knowingly leaving the jurisdiction" because, if a defendant does not know what counties encompass the Northern District of Illinois, a defendant could unknowingly leave the jurisdiction and be in violation of his/her supervised release.

11

*Special Conditions*

Pursuant to 18 U.S.C. § 3563(b)(22), which allows for "other conditions as the court may impose," the probation office recommended two additional conditions.

First, the probation officer recommended that defendant participate in a General Educational Development program and seek to obtain a GED within the first year of supervised release. (PSR, Special Condition #1). According to the PSR, defendant dropped out of Thornton High School sometime in 2009, after having attended high school for approximately one year. (PSR, at ¶61). This condition is reasonable and does not impose an undue burden on defendant. Defendant will need a GED if he is going to obtain lawful employment after he serves a term of imprisonment. Without a GED, Galvan will be set up to fail.

Second, the probation office recommended that Galvan participate in a job skill-training program. (PSR, Special Condition #2). According to the PSR, Galvan has never been employed and he has no formal or technical training for employment. (PSR, at ¶62). If Galvan is going to have any chance at successful rehabilitation after he is released from the custody of the Bureau of Prisons, the government contends, a job-skill training program (as well as GED) is vital and will only benefit the defendant.

Third, the probation office recommended that Galvan, if unemployed after a certain point on supervised release, fulfill 20 hours of community service. (PSR, Special Condition #3). This condition supports Galvan's reintegration into the community by preventing him from returning to his gun and drug-dealing ways

while, at the same time, requiring him to actively participate and improve his community. In addition, the government requests that the Court specify that the community service shall not exceed 400 hours over the course of Galvan's three-year term of supervised release. *See Thompson*, 777 F.3d at 381 (citing U.S.S.G. § 5F1.3).

Fourth, the probation office recommended that the defendant be ordered to provide documentation to the IRS and pay taxes as required by law. (PSR, Special Condition #8). The government contends that there is no factual basis to impose this financial-related condition on Galvan, who stands convicted of gun and drug trafficking.

Fifth, the probation office recommended that Galvan be ordered to pay any fine as a condition of supervised release. (PSR, Special Condition #10). While Galvan's limited financial situation makes any fine highly unlikely, the government has no objection to this condition in the instance the Court imposes a fine.

Sixth, the probation office recommended that Galvan "not enter into any agreement to act as an informer or special agent of a law enforcement agency without the permission of the court." (PSR, Special Condition, #11). Preventing Galvan from working with law enforcement as an informant or source will assist in his reintegration into the community and allow him to steer clear of the criminal underworld upon his release from prison. *See Kappes*, 782 F.3d at 851 (finding that the district court's lack of findings to support this condition was harmless because "acting as a confidential informant is generally inconsistent with the rehabilitative

and re-integrative goals of supervision") (internal quotation and end citation omitted).

## CONCLUSION

For the foregoing reasons, the United States respectfully requests this Court impose a custodial term of imprisonment within the advisory custody Guidelines range of 33 to 41 months.

Respectfully submitted,

ZACHARY T. FARDON
United States Attorney

By: /s/Timothy J. Storino
TIMOTHY J. STORINO
Assistant United States Attorney
219 South Dearborn Street, Room 500
Chicago, Illinois 60604
(312) 353-5347